## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

PROMOTIONAL HEADWEAR INT'L, INC.,
individually and on behalf of all
others similarly situated,

        Plaintiff,

v.

THE CINCINNATI INSURANCE COMPANY,
INC.,

        Defendant.

Case No. 20-cv-2211-JAR-GEB

## PLAINTIFF'S RESPONSE IN OPPOSITION TO
## DEFENDANT THE CINCINNATI INSURANCE COMPANY'S MOTION TO DISMISS

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ................................................................................................ 1

II.    FACTS ............................................................................................................... 3

       A.     The COVID-19 Pandemic ........................................................................ 3

       B.     Plaintiff's Policy ..................................................................................... 4

III.   LEGAL STANDARD ...................................................................................... 4

       A.     Rule 12(b)(6) .......................................................................................... 4

       B.     Interpretation of Insurance Policies ...................................................... 5

IV.    ARGUMENT ................................................................................................... 6

       A.     Plaintiff has Plausibly Pleaded a Covered Loss ................................... 6

       B.     The Policy is at Least Ambiguous ......................................................... 9

       C.     There is No Requirement that COVID-19 Must Have "Physically
              Altered" Plaintiff's Property. ............................................................ 11

       D.     There is No Requirement that COVID-19 "Affect the Structural
              Integrity" of Plaintiff's Property. ..................................................... 14

       E.     Plaintiff is entitled to Civil Authority, Ingress/Egress, and Sue & Labor
              coverage under the Policy. ................................................................ 15

V.     CONCLUSION ............................................................................................. 18

## I.   INTRODUCTION

Plaintiff Promotional Headwear International, Inc., is a wholesale distributor of headwear, bags, aprons, towels, and other products, including custom promotional caps sold to businesses across the globe for marketing purposes. Plaintiff operates under the tradename Sportsman Cap & Bag. It was established in 1937, is family-owned business, and has at least 16 distributors worldwide. Like many other businesses around the country, Plaintiff has suffered a devastating impact to its business as a result of the COVID-19 pandemic. The presence of the virus in and around Johnson County, Kansas, and the Kansas City metropolitan area, and government shut down orders greatly impacted its business, and although these restrictions have been relaxed, Plaintiff's revenues continue to be depressed.

To protect itself from an unexpected loss like that caused by the pandemic spread of a life-threatening virus, Plaintiff purchased an *all-risk* property insurance policy (the "Policy") from Defendant The Cincinnati Insurance Company, Inc. The Policy includes coverage for "Business Interruption" and contains *no* exclusion for virus or pandemic related losses. Nonetheless, after Plaintiff paid its premiums and promptly submitted a notice of claim, Cincinnati denied coverage. Plaintiff filed this lawsuit, and Cincinnati followed with the instant motion to dismiss ("Motion").

Cincinnati's Motion is premised almost entirely on a single argument: that COVID-19 is not a "direct physical loss" as required for coverage to exist under the Policy. According to Cincinnati, the Policy requires "actual, tangible, permanent, physical alteration of property" to trigger coverage. Cincinnati's position is inconsistent with a straightforward reading of the Policy and must be rejected.

The Policy is an "all-risk" policy. It covers "accidental physical loss or accidental physical damage," unless the loss or damage is specifically excluded elsewhere in the Policy.

The insurance industry has recognized for years that viruses can trigger coverage under property insurance policies like Plaintiff's and drafted an exclusion of loss "due to disease-causing agents such as viruses and bacteria." Many property policies contain this exclusion. Crucially, Plaintiff's Policy does not. Cincinnati could have offered a policy that excluded coverage for losses related to viruses like COVID-19 but chose not to, and the absence of this exclusion in Plaintiff's Policy provides strong evidence that Plaintiff's virus-related losses are covered.

Under the facts alleged, which must be treated as true for purposes of the Motion, COVID-19 is a covered loss under a straightforward reading of the Policy. As alleged in the Complaint, and described more fully below, COVID-19 has spread widely throughout the United States, including the Kansas City metropolitan area. The spread of COVID-19 caused physical loss and physical damage to Plaintiff's premises. The presence of the virus itself, and orders issued in response by state and local governments, caused Plaintiff to reduce or cease operations altogether on its covered premises, resulting in business income losses covered by the Policy. Moreover, COVID-19 caused physical loss and physical damage to the area surrounding Plaintiff's property, which prompted state and local governments to impose "Stay at Home" orders placing restrictions on people and businesses, including requirements that residents stay home and that restaurants cease or substantially alter their operations. Those orders trigger coverage under the Policy's "Civil Authority" provisions. Under these provisions Plaintiff need not show that its property suffered a covered loss; it need only show that the area *surrounding* Plaintiff's property suffered a loss.

Under Kansas law, which requires the Court to read the Policy from the view of a reasonably prudent insured, the Policy unambiguously covers COVID-19-related losses. At a minimum, however, the Policy is ambiguous and must be construed against Cincinnati, which

2

could have easily written the Policy to include the insurance industry's standard virus exclusion or define the terms "physical loss" and "physical damage" to embrace the meaning Cincinnati now advances. Cincinnati did neither. So, as it stands, nothing in the Policy (or in the ordinary use of the English language) limits "physical loss" to "permanent physical alteration" of the property as Cincinnati contends. Cincinnati's failure to include a virus exclusion or otherwise define key terms in the Policy creates an ambiguity, which must be construed against it. The Court should, therefore, deny Cincinnati's Motion to Dismiss.

## II. FACTS

### A. The COVID-19 Pandemic

As of the date Plaintiff filed its Complaint (April 24, 2020), more than 46,000 Americans had died of COVID-19, and the department of health for Johnson County reported 403 confirmed cases of COVID-19.[1] Dkt. 1 at ¶¶ 6, 30. In response to COVID-19's rapid, deadly spread across the United States in February and March 2020, state and local governments imposed directives – often called "Stay at Home Orders" – requiring residents to stay in their homes, except to perform certain "essential" activities. *Id.* at ¶ 10. The Stay at Home Orders generally required non-essential businesses to close. *Id.* at ¶ 11. According to the New York Times, at one point 95% of the United States population was under one or more state or local Stay at Home Orders. *Id.* at ¶ 10.

Plaintiff's facility is located in Johnson County, Kansas. *Id.* at ¶ 12. The State of Kansas, and Johnson County, Kansas issued Stay at Home Orders in March 2020 that affected Plaintiff's

---

[1] In the time since, these numbers have dramatically increased. Today, more than 300 Kansans and 130,000 Americans have died of COVID-19 according to the Coronavirus Resource Center at Johns Hopkins University, and there have been more than 21,000 confirmed COVID-19 cases in Kansas and 3.5 million confirmed cases in the United States.

operations and prevented it from meeting sales targets. *Id.* at 14. This caused a devastating drop in revenue for Plaintiff. *Id.*

### B. Plaintiff's Policy

As a responsible business owner, Plaintiff protected itself for an unanticipated event like the COVID-19 pandemic by purchasing a businessowners property insurance policy from Cincinnati, Policy No. 05ECP0562300. *Id.* at ¶ 17; Dkt. 1-1 at 3. The limits of liability exceed $1 million. Dkt. 1-1 at 3. The Policy covers all risks of loss that are not otherwise excluded. *See* Dkt. 1-1 at 6. The Policy contains a "Business Income (and Extra Expense) Coverage Form," which covers losses most directly at issue here. *Id.* at 75. Specifically, it provides coverage for:

- "Business Income" and "Extra Expense" – losses sustained due to the necessary suspension of operations and expenses incurred to minimize the suspension of business (*id.* at 75);

- "Civil Authority" – losses from interruption of business caused by an order from a civil authority (*id.* at 76); and

- "Ingress or Egress" – losses caused by the prevention of existing ingress or egress (*id.* at 78)

The Policy also covers expenses necessary to protect insured property from further damage in the event of a loss under its provisions for "Sue and Labor" coverage (*id.* at 79).

Plaintiff submitted a claim for coverage related to COVID-19 in March 2020. Dkt. 1 at ¶ 64. In response to the notice of claim, Cincinnati denied coverage and refused to cover Plaintiff's COVID-19 losses. *Id.*

## III. LEGAL STANDARD

### A. Rule 12(b)(6)

On a motion to dismiss, "the court must accept the Complaint's allegations as true and view them in the light most favorable to plaintiffs." *Palmer v. Shawnee Mission Medical Ctr., Inc.*, Case No. 16-2750-DDC-GLR, 2017 WL 5629624, at *6 (D. Kan. Nov. 22, 2017).

Accepting the allegations as true, Plaintiff need only allege "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)).

### B.    Interpretation of Insurance Policies

"Kansas courts interpret policy terms based on how a reasonably prudent insured would understand them." *BancInsure, Inc. v. F.D.I.C.*, 796 F.3d 1226, 1233 (10th Cir. 2015) (citing *O'Bryan v. Columbia Ins. Grp.*, 56 P.3d 789, 793 (Kan. 2002)). It is well-settled that "courts consider the policy as a whole, rather than viewing provisions in isolation." *Id.* "'Where the language of an insurance policy is clear and unambiguous, [courts] apply it in its plain and ordinary sense." *Id.* (citing *Warner v. Stover*, 153 P.3d 1245, 1247 (Kan. 2007)). But "[w]here the terms of a policy of insurance are ambiguous or uncertain, conflicting, or susceptible of more than one construction, the construction most favorable to the insured must prevail." *Catholic Diocese of Dodge City v. Raymer*, 840 P.2d 456, 459 (Kan. 1992).

A contract is ambiguous if it "'contains provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language." *BancInsure*, 796 F.3d at 1233 (quoting *O'Bryan*, 56 P.3d at 792). One reason behind the firmly established rule that ambiguities are construed in favor of the insured is that, "[s]ince the insurer prepares its own contracts, it has a duty to make the meaning clear." *Catholic Diocese*, 840 P.2d at 459 (Kan. 1992); *accord* 16 Williston on Contracts § 49:15 (4th ed.) (the rule incentivizes insurers to "use clear, explicit and precise language"). Because it is on the insurer to draft policies with clear and unquestionable language, "uncertainty" bears special attention here. *Catholic Diocese*, 840 P.2d at 459.

## IV. ARGUMENT

### A.       Plaintiff has Plausibly Pleaded a Covered Loss.

The Policy covers direct "loss" to property. Dkt. 1-1 at 6. It defines "loss" as "accidental physical loss or accidental physical damage." *Id.* at 41. Plaintiff alleges that COVID-19 constitutes physical loss and physical damage because the presence of COVID-19 on and around the insured property deprived Plaintiff of the use of its property and also damaged it.[2] Cincinnati seeks dismissal, arguing that Plaintiff has failed to plead a covered loss because "direct physical loss requires actual, tangible, permanent, physical alteration of property." Dkt. 8 at 12. But nothing in the Policy or Kansas law supports Cincinnati's narrow reading of "loss."

First, Cincinnati's interpretation of "loss" is inconsistent with the plain terms of the Policy and violates rudimentary rules of contract interpretation. In construing insurance policies, a court must read policy provisions in the context of the whole policy, give meaning to each provision, and eliminate surplusage where possible. *Lawson v. Spirit AeroSystems, Inc.*, No. 18-cv-01100-EFM-KGS, 2018 WL 3973150, at *8 (D. Kan. Aug. 20, 2018). Under the plain terms of the Policy, "loss" includes both "physical loss" *and* "physical damage." Dkt. 1-1 at 56 Cincinnati's interpretation wrongly assumes that "physical loss" and "physical damage" are synonymous and ignores the term "damage" altogether. But "if 'physical loss' was interpreted to mean 'damage,' then one or the other would be superfluous." *Nautilus Grp., Inc. v. Allianz*

---

[2] Even the imminent threat of loss or harm from the spread of COVID-19 is sufficient to constitute physical loss and damage to Plaintiff's property. *See Port Authority of New York & New Jersey v. Affiliated FM Insurance*, 311 F.3d 226, 236 (3d Cir. 2002) ("if there exists an imminent threat of release of a quantity of asbestos fibers that would cause such loss of utility"); *Motorists Mutual Ins. v. Hardinger*, 131 F.App'x 823, 827 (3d Cir. 2005) (imminent threatened release of contamination causes loss of use or utility); *Murray v. State Farm Fire & Cas. Co.*, 509 S.E.2d 1, 17 (W.Va. 1998) ("physical loss" found based on imminent risk of falling rocks not on the premises).

*Global Risks US*, No. C11-5281BHS, 2012 WL 760940, at *7 (W.D. Wash. March 8, 2012); *see also Total Intermodal Servs. Inc. v. Travelers Prop. Cas. Co. of Am.*, No. CV 17-04908AB (KSx), 2018 WL 3829767, at *3 (C.D. Cal. July 11, 2018) ("[T]o interpret 'physical loss of' as requiring 'damage to' would render meaningless the 'or damage to' portion of the same clause, thereby violating a black-letter canon of contract interpretation – that every word be given a meaning.").

Second, Cincinnati's assertion that "direct physical loss requires actual, tangible, permanent, physical alteration of property" is plucked out of thin air. The Policy does not define "physical loss" or "physical damage." *See generally* Dkt. 1-1. And the words "tangible," "permanent," and "alteration," while found elsewhere in the Policy, are not included in the section for, nor do they otherwise have anything to do with, "Covered Causes of Loss."

Third, Plaintiff incurred "physical loss" of property when its premises suffered actual contamination by COVID-19, and related government shut down orders prohibited the public from accessing Plaintiff's covered premises. Because the Policy does not define "physical loss," the Court must give the term its "plain, ordinary, and popular meaning[]." *Crescent Oil Co., Inc. v. Federated Mut. Ins. Co.*, 888 P.2d 869, 871 (Kan. Ct. App. 1995). Dictionary definitions of "loss," include "the act of losing possession" and "deprivation." *See* Merriam-Webster, https://www.merriam-webster.com/dictionary/loss (last visited July 15, 2020). Plaintiff has been "depriv[ed]" of its property. It invested in the property, insured the property, insured the income it derives from the property, but has been deprived of the use of the property because of COVID-19 and related government shutdown orders. The "reasonably prudent insured," *BancInsure*, 796 F.3d at 1233, purchasing protection under the Policy would understand loss of use of the covered property as a *physical loss* covered under the Policy.

Even the plain meaning of the term "damage" – which is also not defined in the Policy – is not so narrowly limited to only physical alteration of property. As one court explained, "damage" instead includes any reduction in the property's "value or usefulness":

> One dictionary defines "damage" as "injury or harm that reduces value or usefulness." *Random House Dictionary of the English Language*, 504 (2nd ed.1987). Another defines it as "injury or harm to a person or thing, resulting in a loss in soundness, value, etc." *Webster's New World Dictionary*, 356 (2nd ed.1980). A legal dictionary defines "damage" in part as "every loss or diminution" of a person's property. *Black's Law Dictionary* 389 (6th ed.1990). Clearly, without qualification, the term "damage" encompasses more than physical or tangible damage.

*Dundee Mut. Ins. Co. v. Marifjeren*, 587 N.W.2d 191, 194 (N.D. 1998). Indeed, as alleged in the Complaint, the local government shutdown orders recognize that COVID-19 damages property. The Johnson County, Kansas Order stated COVID-19 "'endanger[s] health, safety and welfare of persons and **property** within the borders of Johnson County, Kansas' and that it 'remains a public disaster affecting life, health[ ], **property**, and the public space.'" Dkt. 1 at ¶ 46.a. Nearby Kansas City, Missouri's similar shutdown order stated that "'the City wishes to employ all means available under the law to protect public life, health, safety and **property** to limit the development, contraction and spread of COVID-19.'" *Id.* at ¶ 46.b.

Fourth, courts across the country widely agree – and have done so for years – that the loss of or access to a property, including loss of its essential functionality, constitutes a physical loss of property. *See, e.g.*, *TRAVCO Ins. Co. v. Ward*, 715 F. Supp. 2d 699, 702 (E.D. Va. 2010), *aff'd*, 504 F. App'x 251 (4th Cir. 2013) (rejecting the insurer's argument that physical damage requires some "physical alteration or injury to the property's structure and finding direct physical loss because "the building in question had been rendered unusable by physical forces"); *Universal Sav. Bank v. Bankers Standard Ins. Co.*, No. B159239, 2004 WL 515952, at *6 (Cal. Ct. App. Mar. 17, 2004) ("The plain meaning of 'direct physical loss' encompasses physical

displacement or loss of physical possession. That the loss must be 'physical' distinguishes the loss from some other, incorporeal loss."), *vacated on other grounds*, No. B159239, 2004 WL 3016644 (Cal. Ct. App. Dec. 30, 2004); *see also Murray v. State Farm Fire & Cas. Co.,* 509 S.E.2d 1, 17 (W.Va. 1998) (holding that losses that rendered insured property "unusable or uninhabitable, may exist in the absence of structural damage to the insured property."); *Gregory Packaging, Inc. v. Travelers Prop. Cas. Co. of Am.,* No. 2:12-cv-04418 (WHW)(CLW), 2014 WL 6675934, at *5 (D.N.J. Nov. 25, 2014) ("[P]roperty can be physically damaged, without undergoing structural alteration, when it loses its essential functionality."); *Dundee Mut. Ins. Co. v. Marifjeren,* 587 N.W.2d 191, 194 (N.D. 1998) (holding coverage applied without physical alteration because the covered properties "no longer performed the function for which they were designed."); *W. Fire Ins. Co. v. First Presbyterian Church,* 165 Colo. 34, 38–39, 437 P.2d 52, 55 (1968) (holding that gasoline saturation under and around a church rendering occupancy unsafe constituted a "direct physical loss within the meaning of that phrase.").

The fact that courts have (for decades) construed physical loss broadly proves that Plaintiff's interpretation of the Policy is not only a reasonable reading, but the only reasonable reading. The Court should have no trouble denying Cincinnati's Motion and concluding the Policy unambiguously covers the losses alleged in the Policy.

**B.    The Policy is at Least Ambiguous.**

Nonetheless, the Motion must still be denied even if Cincinnati is able to show its reading of the Policy is at least reasonable. In light of the cases cited above, Cincinnati should have known that an ordinary person might reasonably read the Policy as Plaintiff has done. Thus, at minimum, the Policy is ambiguous and must be construed against Cincinnati.

At the outset, courts have held that the phrase "direct physical loss" is ambiguous. *See Hampton Foods, Inc. v. Aetna Cas. & Sur. Co.*, 787F.2d 349, 352 (8th Cir. 1986) ("We agree

that the disputed language ["direct physical loss"] is ambiguous and, thus, must be construed in

Hampton's favor."). And if Cincinnati wanted the Policy to exclude virus-related losses, it could

have, but chose not to, draft the Policy to exclude such coverage. As alleged in the Complaint, in

2006, following the outbreak of the SARS virus, the Insurance Services Office ("ISO") (an

industry organization that provides policy writing services to insurers) announced the submission

of an exclusion of loss "due to disease-causing agents such as viruses and bacteria." Dkt. 1 at

¶ 53. In connection with circulating the virus exclusion, the ISO sent the following statement to

state insurance regulators:

> Disease-causing agents may render a product impure (change its quality or
> substance), or enable the spread of disease by their presence on interior building
> surfaces or the surfaces of personal property. When disease-causing viral or
> bacterial contamination occurs, potential claims involve the cost of replacement
> of property (for example, the milk), cost of decontamination (for example, interior
> building surfaces), and business interruption (time element) losses. Although
> building and personal property could arguably become contaminated (often
> temporarily) by such viruses and bacteria, the nature of the property itself would
> have a bearing on whether there is actual property damage. An allegation of
> property damage may be a point of disagreement in a particular case.

*Id.* at ¶ 54. Despite the availability and widespread use of a specific exclusion for viruses like

COVID-19, Cincinnati wrote no such exclusion into this Policy. *Id.* at ¶ 55. Nor does the Policy

contain an exclusion for "pandemics," "communicable disease," or "anything similar." *Id.*

Cincinnati downplays the significance of the ISO bulletin, arguing that the ISO also

stated that property policies have not typically been a source of recovery for losses from

contamination by disease-causing agents. Dkt. 8 at 16-17. But, if that was so obvious, the ISO

virus exclusion would be redundant, and other insurance companies would not have included it

in their policies. Indeed, if no reasonable reader could be led to understand that a virus can cause

a "physical loss" as Cincinnati insists, the exclusion is not only unnecessary, but non-sensical.

The purpose of the rule construing ambiguous policies against the drafter is to incentivize

10

insurers to "use clear, explicit, and precise language." 16 Williston on Contracts § 49:15. The ISO exclusion strongly shows that a reasonable insured could believe that losses caused by the COVID-19 virus are covered under the Policy. Cincinnati's decision not to include it, thus, supports denial of Defendant's Motion.

### C.      There is No Requirement that COVID-19 Must Have "Physically Altered" Plaintiff's Property.

Because it can identify nothing in the Policy to support its interpretation, Cincinnati asserts that "numerous court decisions hold that direct physical loss requires actual, tangible, permanent, physical alteration of property." Dkt. 8 at 10. Defendant is wrong. None of the cases on which Defendant relies support that view.

Defendant principally relies on *Great Plains Ventures, Inc. v. Liberty Mutual Fire Insurance Co.*, 161 F. Supp.2d 970 (D. Kan. 2016). *Id.* But it is easily distinguishable. There, the plaintiff sought coverage for hail damage that caused "minor impact damage or blemishes" to roofs on several metal buildings. *Id.* at 975. The defendant denied coverage, arguing that the applicable policy covered only hail damage that impacted the roofs' "usefulness or function for normal purposes." *Id.* at 976. But the court granted summary judgment for the plaintiff, concluding that the applicable policy covered even "cosmetic hail damage." *Id.* at 980. That ruling is not inconsistent with Plaintiff's reading of the Policy here. Both in *Great Plains*, and here, the Policy covered physical loss *and* physical damage. Loss of usefulness or function is, as explained above, sufficient under the former, while in *Great Plains* mere cosmetic damage was sufficient under the latter.

Defendant also cites *Source Food Technology, Inc. v. U.S. Fid. & Guar. Co.*, 834 (8th Cir. 2006), which it calls a "seminal case concerning the direct physical loss requirement." Dkt. 8 at 13. However, in *Source Food*, both parties *agreed* there was "no evidence that the beef

product was contaminated by mad cow disease." 465 F.3d at 835. Indeed, Source Food went so far as to "concede[] that the beef product inside the truck in Canada was not physically damaged or contaminated." *Id.* at 837. In contrast, Plaintiff alleges here that COVID-19 was present on Plaintiff's properties. Plaintiff alleged that as of the date of filing, April 24, 2020, there were 403 confirmed cases of COVID-19 in Johnson County. Dkt. 1 at ¶ 30. Plaintiff also alleged that COVID-19 spreads through both droplets and aerosols, and that aerosols in particular are so light that they can be suspended in air, travel long distance, and land on surfaces long distances away. *Id.* at ¶¶ 7-8. The virus can live on surfaces for "several days, if not longer," and infect someone who touches the surface, and then touches their mouth, nose, or eyes. *Id.* at ¶ 34. All of this supports Plaintiff's allegation, which must be taken as true, that it is "likely" that "customers, employees, and/or other visitors to the insured property were infected with the coronavirus and thereby caused physical loss and damage." *Id.* at ¶ 15.

The facts alleged here are analogous to two cases that the Eighth Circuit contrasted with the facts of *Source Food*. 465 F.3d at 837. In *Sentinel Mgmt. Co. v. St. Paul Fire & Marine Ins. Co.*, 563 N.W.2d 296 (Minn. Ct. App. 1997), a claim was brought under a policy covering "direct physical loss to building(s) and was based on asbestos fibers and resulting contamination of apartment buildings." *Id.* at 298. The Minnesota Court of Appeals held that the presence of asbestos constituted direct physical loss to the properties because the building's function was "impaired." *Id.* at 300. In *General Mills, Inc. v. Gold Medal Ins., Co.*, 622 N.W.2d 147 (Minn. Ct. App. 2001), 16 million barrels of General Mills' raw oats were treated with a pesticide not approved by the FDA for use on oats. *Id.* at 150. Even though consumption of the oats was not hazardous to human health, the pesticide-treated oats violated FDA regulations and could not be used in General Mills' products. *Id.* Because the pesticide, in conjunction with the government

regulations, "rendered the oats unusable, General Mills was entitled to coverage for 'direct physical loss or damage to property.'" *Source Food*, 465 F.3d at 837 (discussing *General Mills*).

This case is on all fours with *Sentinel* and *General Mills*. Plaintiff alleges that COVID-19 was on the insured property or surrounding areas and, under *General Mills*, Plaintiff need not even show that the virus was harmful when it reached the property. Rather, it is sufficient at this stage to allege that the virus reached the insured property or rendered it "unusable" for its intended purpose.

Cincinnati's reliance on the Eighth Circuit's decision in *Pentair, Inc. v. Am. Guarantee & Liab. Ins. Co.*, 400 F.3d 613 (8th Cir. 2005) provides no more help than *Source Food*. Dkt. 8 at 14. There, the Eighth Circuit rejected the insured's argument that its Taiwanese suppliers' inability to function after a loss of power constituted direct physical loss or damage. 400 F.3d at 616. But again, there the earthquake did not directly affect the insured property; it affected a power plant that provided power to the insured property. As in *Source Food*, the plaintiff failed to allege any condition affecting the insured property or area surrounding the insured property. Plaintiff here alleges that COVID-19 was on the insured property and surrounding areas.[3]

Finally, if Cincinnati wanted to ensure its provision of coverage required a distinct, physical alteration of property, it could have drafted the Policy to say precisely that. But it chose not to and, in fact, did not provide any definition at all for "physical loss" and "physical

_____

[3] Cincinnati cites *Couch on Insurance* for the proposition that the word "physical" means "intangible or incorporeal" losses are not covered. Dkt. 8 at 12 (quoting 10A *Couch on Ins.* § 148:46). The losses alleged here are not intangible or incorporeal. But, as the treatise makes clear, "intangible or incorporeal" losses involve things like aesthetic changes, which do not affect the value of the property, or claims of damage from a title defect. *See id.* at 1 n.5, 6. In contrast, COVID-19 is a physical, tangible virus that has deprived Plaintiff of the full enjoyment of its property.

damage." Because an ordinary insured could easily conclude "physical loss" includes a COVID-19 related closure of business, any ambiguity about whether Plaintiff's Policy requires "permanent, physical alteration" must be resolved against Defendant.

**D.     There is No Requirement that COVID-19 "Affect the Structural Integrity" of Plaintiff's Property.**

Next, Defendant invents another definition of "loss," arguing there is no coverage without some change in the "structural integrity" of the insured property and any virus that can be cleaned is not property damage. Dkt. 8 at 15-16. As an initial matter, Cincinnati fails to square its invented requirement with the very authorities it cites here, including one from this District. For instance, *Great Plains* concluded there was coverage for hail damage that was cosmetic, which would fail under Cincinnati's "structural integrity" test.

Again, the Policy does not define "physical loss or damage," so there is nothing in the Policy to support this construction, and the ordinary meaning of "loss" includes "deprivation." *See* Merriam-Webster, https://www.merriam-webster.com/dictionary/loss (last visited July 15, 2020). Consistent with this definition, cases widely recognize that loss of use of property, even without structural damage, is a covered loss. *See Murray*, 509 S.E.2d 1, 17 (W. Va. 1998) (losses that render insured property "*unusable or uninhabitable*, may exist in the absence of structural damage to the insured property"; policyholders suffered "direct physical loss" when their homes were rendered uninhabitable due to threat of rockfall) (emphasis added); *W. Fire Ins. Co. v. First Presbyterian Church*, 437 P.2d 52, 55 (Colo. 1968) ("the church building was *rendered uninhabitable* and the continued *use thereof highly dangerous* because of the infiltration and contamination of the church building") (emphasis added); *Pepsico, Inc. v. Winterthur Int'l Am. Ins. Co.*, 806 N.Y.S.2d 709, 711 (App. Div. 2005) (rejecting argument that "demonstrable alteration" was required, holding instead that coverage is triggered when the "function and value

14

[of the property] have been seriously impaired"); *Sentinel*, 563 N.W.2d at 300 (finding coverage for asbestos contamination that did not result in tangible injury to the physical structure of a building, holding that "a building's function may be *seriously impaired or destroyed and the property rendered useless* by the presence of contaminants" (emphasis added); *Hughes v. Potomac Ins. Co. of D.C.*, 18 Cal. Rptr. 650, 655 (Ct. App. 1962) (coverage found because nearby landslides rendered a dwelling "*completely useless* to its owners") (emphasis added). Cincinnati's argument that COVID-19 cannot cause "loss" under the Policy unless it structurally alters Plaintiff's property is without merit. Moreover, the notion that COVID-19 can be easily removed is spurious and irrelevant. The fact that one of the reasons for the Stay at Home Orders prohibiting access to businesses like Plaintiff's is that COVID-19 is difficult to physically detect and remove further supports a conclusion COVID-19 caused property loss. And in many instances, one might say that structural damage could be "easily repaired" by replacing a few loadbearing pieces of wood, but coverage is nowhere dependent in the Policy on the degree of effort necessary to make the premises inhabitable again.

It warrants repeating that if Cincinnati wanted to ensure that coverage requires structural alteration that cannot be cured by cleaning, it could have defined "physical loss" and "physical damage" and included those specific words. Defendant chose not to. As a result, any ambiguity about whether Plaintiff's Policy requires structural alteration that cannot be resolved by cleaning must be resolved against Defendant.

> **E.**     **Plaintiff is entitled to Civil Authority, Ingress/Egress, and Sue & Labor coverage under the Policy.**

Cincinnati argues that Plaintiff's claims for Civil Authority coverage fail. The Civil Authority provision in Plaintiff's Policy covers losses sustained when an action of a "civil authority" – like a Stay at Home Order – prohibits access to the insured premises because

(1) access to the area immediately surrounding the damaged property is prohibited by a civil authority; and (2) the action of the civil authority is taken in response to a dangerous physical condition resulting from physical loss or physical damage. Dkt. 1-1 at 76. Cincinnati argues Plaintiff fails on both prongs, but Cincinnati is incorrect.

First, Cincinnati argues that no Stay at Home Order "prohibited" access to Plaintiff's property because some employees were permitted on site. Dkt. 8 at 20. That argument is entirely without merit. Under the relevant Stay at Home Orders, the general public were ordered to stay in the homes and venture out only for "essential activities." Dkt. 1 at ¶ 10. Cincinnati does not point to anything it the Policy that says Civil Authority coverage only applies if *everyone* is prohibited from accessing the property. *See, e.g.*, *Narricot Indus., Inc. v. Fireman's Fund Ins. Co.*, No. CIV.A.01-4679, 2002 WL 31247972, at *1 (E.D. Pa. Sept. 30, 2002) (civil authority coverage existed even though government's order allowed "emergency personnel" to access property); *TMC Stores, Inc. v. Federated Mut. Ins. Co.*, 2005 WL 1331700, at *4 (Minn. Ct. App. June 7, 2005) (in analyzing whether access to property was prohibited for purposes of a civil authority provision, court assessed whether "customers' access to the store was prohibited").

Cincinnati cites several cases in support of its extremely narrow interpretation, but all are readily distinguishable. For example, Cincinnati relies on *Southern Hospitality, Inc. v. Zurich Am. Ins. Co.*, 393 F.3d 1137 (10th Cir. 2004). There, the inured-hotel owner sought coverage after the FAA grounded all flights after 9/11, causing a substantial drop in hotel bookings. *Id.* at 1138. The Tenth Circuit concluded civil authority coverage did not apply because the FAA orders banned flights, not access to hotels. *Id.* But unlike that case, access to Plaintiff's establishments were and are directly subject to the Stay at Home Orders because they

specifically prohibited the public from entering Plaintiff's premises. *Ski Shawnee, Inc. v. Commonwealth Ins. Co.*, 2010 WL 2696782, at *4 (M.D. Pa. July 6, 2010) is no different. Unlike a ski resort indirectly affected by a bridge closure, the Stay at Home Orders directly implicated Plaintiff's operations. *Id.* at *4. Finally, the word "prohibited" is not defined in the Policy. At a minimum, it is ambiguous and must be resolved against Defendant's and in favor of Plaintiff's reasonable construction.

Second, Defendant repeats its argument that COVID-19 cannot constitute physical loss or physical damage to property. Dkt. 8 at 18-19. Cincinnati again relies on *Great Plains Ventures* and *Source Food*. But for the reasons stated above – namely that COVID-19 damages property and also deprives persons of the use of property – Cincinnati is wrong. Moreover, under the Civil Authority provision, Plaintiff need not show loss or damage to *its* covered property. It need only show loss or damage to *surrounding* property. Dkt. 1 at ¶ 56. Governments issued Stay at Home Orders in response to the wide spread of COVID-19 throughout the community, which includes the area surrounding Plaintiff's property. The Court should deny Defendant's Motion as to the Policy's Civil Authority coverage.

Cincinnati also argues Plaintiff cannot recover under the Policy's Ingress and Egress coverage. Dkt. 8 at 21. Ingress and Egress covers losses sustained if ingress to and egress from insured premises is prohibited due to physical loss or physical damage. Dkt. 1-1 at 77. Again, Plaintiff's property was damaged by COVID-19 and customers were prohibited from entering the premises. That states a plausible claim for coverage. Defendant also argues that Ingress and Egress does not apply if access is prohibited as a result of a civil authority order. Dkt. 8 at 21. But Plaintiff has alleged that access to its property was caused by COVID-19 in addition to, and

separate from, any Stay at Home Order. *See, e.g.*, Dkt. 1 at ¶¶ 2, 14-16, 30. The Court should deny Defendant's Motion with respect to Ingress and Egress coverage.

Finally, Cincinnati argues that Plaintiff is not entitled to Sue & Labor reimbursement because "there is no direct physical loss to Plaintiff's Covered Property." Dkt. 8 at 21. For the reasons stated in this Opposition, Cincinnati is incorrect, and the Court should deny its Motion as to Sue & Labor coverage.

## V. CONCLUSION

Cincinnati has failed to satisfy its high burden at the motion to dismiss stage. Plaintiff's Complaint properly alleges claims for Business Income, Civil Authority, Extra Expense, Ingress and Egress, and Sue and Labor Coverage for losses arising COVID-19 and related state and local government shutdown orders. The Court should deny the Motion. In the alternative, if the Court believes the Motion should be granted, in whole or in part, Plaintiff seeks leave to amend its Complaint.

Dated: July 22, 2020                    Respectfully submitted,

                                        **STUEVE SIEGEL HANSON LLP**

                                        */s/ Patrick J. Stueve*
                                        Patrick J. Stueve, MO #37682
                                        Bradley T. Wilders, MO #60444
                                        Curtis Shank, MO #66221
                                        460 Nichols Road, Suite 200
                                        Kansas City, Missouri 64112
                                        Telephone:    816-714-7100
                                        Facsimile:    816-714-7101
                                        Email:        stueve@stuevesiegel.com
                                        Email:        wilders@stuevesiegel.com
                                        Email:        shank@stuevesiegel.com

**MILLER SCHIRGER LLC**

John J. Schirger, MO # 60583
Matthew W. Lytle, MO #59145
Joseph M. Feierabend, MO #62563
4520 Main Street, Suite 1570
Kansas City, MO 64111
Telephone:   (816) 561-6500
Facsimile:   (816) 561-6501
Email:        jschirger@millerschirger.com
Email:        mlytle@millerschirger.com
Email:        jfeierabend@millerschirger.com

**LANGDON & EMISON LLC**

J. Kent Emison, MO #29721
911 Main Street
PO Box 220
Lexington, Missouri 64067
Telephone:   (660) 259-6175
Facsimile:   (660) 259-4571
Email:        kent@lelaw.com

**SHAFFER LOMBARDO SHURIN, P.C.**

Richard F. Lombardo, MO# 29748
2001 Wyandotte Street
Kansas City, MO 64108
Telephone:   816-931-0500
Facsimile:   816-931-5775
Email:        rlombardo@sls-law.com

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 22, 2020, I filed the foregoing document via the Court's CM/ECF system, which will cause a true and correct copy of the same to be served electronically on all ECF-registered counsel of record.

/s/ *Patrick J. Stueve*
Attorney for Plaintiff