**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **PROMOTIONAL HEADWEAR INTERNATIONAL, individually and on behalf of all others similarly situated,** | |
| **Plaintiff,** | **Case No. 20-cv-2211-JAR-GEB** |
| **v.** | |
| **THE CINCINNATI INSURANCE COMPANY,** | |
| **Defendant.** | |

**MEMORANDUM AND ORDER**

Plaintiff Promotional Headwear International brings this putative class action against its property insurer, The Cincinnati Insurance Company, for declaratory judgment and breach of contract arising out of Defendant's denial of Plaintiff's insurance claim for property losses sustained due to COVID-19.  Before the Court is Defendant's Motion to Dismiss (Doc. 7).  The motion is fully briefed and the Court has considered the parties' many notices of supplemental authority.  For the reasons explained more fully below, the Court grants Defendant's motion to dismiss.

## I.      Factual Allegations

The following material facts are either alleged in the Complaint or taken from the insurance policy attached thereto.  The well-pled facts alleged in the Complaint are assumed to be true for purposes of deciding this motion.

As of April 24, 2020, when Plaintiff filed its Complaint, more than 46,000 Americans had died of COVID-19, and the Department of Health for Johnson County, Kansas had reported 403 confirmed cases.  The virus can spread by respiratory droplets when an infected person

coughs, sneezes, or talks.  Studies demonstrate that COVID-19 spreads through the air by aerosols, where they can remain for hours or more.  A person can also potentially become infected by touching a surface or object that has the virus on it and then by touching the mouth, nose, or eyes.  According to studies, the virus can live on surfaces for several days if not longer.

In response to COVID-19's rapid, deadly spread across the United States, state and local governments imposed directives in February and March 2020, often called "Stay at Home Orders," requiring residents to stay in their homes except to perform certain "essential" activities.  The Stay at Home Orders generally required non-essential businesses to close.  At one point, 95% of the United States population was under one or more Stay at Home Orders.  The State of Kansas and Johnson County, Kansas issued Stay at Home Orders in March 2020 that were still in effect at the time the Complaint was filed.  The March 24, 2020 Johnson County Order recognized that the virus "endanger[s] health, safety and welfare of persons and property within the border of Johnson County, Kansas," and that it "remains a public disaster affecting life, health, property and the public peace."[1]  The Johnson County Order was issued to mitigate and slow the spread of COVID-19 in the community.  The March 28, 2020 State of Kansas Order directed all Kansans to stay in their homes to slow the spread of COVID-19 with several exceptions.  Like the Johnson County Order, the purpose of the State Order was to "mitigate the spread of COVID-19 throughout Kansas."[2]  On April 16, 2020, the State Order was extended to May 3, 2020.

---

[1] Dr. Joseph LeMaster, Emergency Order of Local Health Officer at 1 (Mar. 22, 2020), https://www.jocogov.org /sites/default/files/documents/CMO/JoCo%20Public%20Health%20Officer%20 Stay%20at%20Home%20Order%203-22-20.pdf; *see also* Doc. 1 ¶ 46(a).

[2] Doc. 1 ¶ 32 (quoting Kan. Exec. Order No. 20-16 at 1 (Mar. 28, 2020), https://governor.kansas.gov/wp-content/uploads/2020/03/EO20-16.pdf).

Plaintiff is a wholesale distributor of headwear, bags, aprons, towels, and other products, including custom promotional caps sold to businesses across the globe for marketing purposes. Plaintiff's facility is located in Johnson County, Kansas.  Plaintiff projected it would exceed $100 million in sales for 2020, but due to the Stay at Home Orders and the risk of transmitting of COVID-19, several of Plaintiff's employees could not show up to work and risk infection, preventing Plaintiff from meeting sales targets.  COVID-19 and the Stay at Home Orders prevented Plaintiff from using its premises for its intended purpose.  Plaintiff suspended its operations in order to mitigate further losses when government officials "announced that COVID-19 posed a risk of causing further physical damage and loss."[3]  As a result, Plaintiff lost nearly 95% of its sales.

Plaintiff purchased property insurance from Defendant, bearing Policy No. 05ECP0562300 (the "Policy"), that did not contain an exclusion for pandemic coverage.  The all-risk Policy is comprised of a number of forms and endorsements that define the scope of coverage.  It covers "direct 'loss' to Covered Property at the 'premises' caused by or resulting from any Covered Cause of Loss."[4]  "Covered Cause of Loss" is defined under the Policy as "direct 'loss' unless the 'loss' is excluded or limited in this Coverage Part."[5]  "Loss" is defined as "accidental physical loss or accidental physical damage."[6]

The Policy includes coverage for business income losses, losses due to certain civil authority orders, and loss of ingress/egress.  The Policy covers "actual loss of 'Business Income' . . . you sustain due to the necessary 'suspension' of your 'operations' during the 'period of

---

[3] *Id.* ¶ 56.

[4] Doc. 1-1 § A, at 6.

[5] *Id.* § A(3)(a), at 8.

[6] *Id.* § G(8), at 41.

restoration.'  The 'suspension' must be caused by direct 'loss' to property at a 'premises' caused

by or resulting from any Covered Cause of Loss."[7]  The civil authority coverage provision states:

> When a Covered Cause of Loss causes damage to property other
> than Covered Property at a "premises", we will pay for the actual
> loss of "Business Income" and necessary Extra Expense you
> sustain caused by action of civil authority that prohibits access to
> the "premises", provided that both of the following apply:
>
> (a)    Access to the area immediately surrounding the damaged
>        property is prohibited by civil authority as a result of the
>        damage; and
>
> (b)    The action of civil authority is taken in response to
>        dangerous physical conditions resulting from the damage or
>        continuation of the Covered Cause of Loss that  caused the
>        damage, or the action is taken to enable a civil authority to
>        have unimpeded access to the damaged property.[8]

The ingress/egress form provides coverage for

> actual loss of "Business Income" you sustain and necessary Extra
> Expense you sustain caused by the prevention of existing ingress
> or egress at a "premises" shown in the Declarations due to direct
> "loss" by a Covered Cause of Loss at a location contiguous to such
> "premises".  However, coverage does not apply if ingress or egress
> from the "premises" is prohibited by civil authority.[9]

The Policy imposes certain duties on the insured in the event of loss or damage, including

to protect the covered property from further damage, and "[k]eep a record of . . . expenses

necessary to protect the Covered Property for consideration in the settlement of the claim."[10]

In March 2020, Plaintiff notified Defendant of a loss under the Policy sustained from

COVID-19 and the Stay at Home Orders.  Specifically, Plaintiff maintains it lost revenue and

---

[7] *Id.* § A(5)(b)(1), at 21; § A(1)(a), at 75.

[8] *Id.* § A(5)(b)(3), at 22.

[9] *Id.* § A(5)(e), at 78.

[10] *Id.* § D(3)(a)(4), at 33–34; § C(2)(a)(4), at 79.

business opportunities due to the suspension of its operations, rendering it unable to fulfill or accept apparel orders.  Defendant requested additional information and refused coverage under the Policy.  In this action, Plaintiff seeks a declaration of the parties' respective rights and duties under the Policy and requests the Court deem Defendant's conduct unlawful and in material breach of the Policy.  Plaintiff also asserts breach of contract claims under Kansas law based on the business income, civil authority, ingress/egress, and Sue and Labor provisions in the Policy.

## II.   Standard

To survive a motion to dismiss brought under Fed. R. Civ. P. 12(b)(6), a complaint must contain factual allegations that, assumed to be true, "raise a right to relief above the speculative level" and must include "enough facts to state a claim for relief that is plausible on its face."[11]  In order to pass muster under Rule 12(b)(6), "the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims."[12] The plausibility standard does not require a showing of probability that a defendant has acted unlawfully, but requires more than "a sheer possibility."[13]  "[M]ere 'labels and conclusions,' and 'a formulaic recitation of the elements of a cause of action' will not suffice; a plaintiff must offer specific factual allegations to support each claim."[14]  Finally, the Court must accept the nonmoving party's factual allegations as true and may not dismiss on the ground that it appears unlikely the allegations can be proven.[15]

The Supreme Court has explained the analysis as a two-step process.  For the purposes of

---

[11] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).

[12] *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

[13] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[14] *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting *Bell Atl. Corp.*, 550 U.S. at 555).

[15] *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

a motion to dismiss, the court "must take all the factual allegations in the complaint as true, [but] we 'are not bound to accept as true a legal conclusion couched as a factual allegation.'"[16]  Thus, the court must first determine if the allegations are factual and entitled to an assumption of truth, or merely legal conclusions that are not entitled to an assumption of truth.[17]  Second, the court must determine whether the factual allegations, when assumed true, "plausibly give rise to an entitlement to relief."[18]  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[19]

Finally, if the Court on a Rule 12(b)(6) motion looks to matters outside the pleadings, it generally must convert the motion to a Rule 56 motion for summary judgment.[20]  However, the Court may consider documents that are referred to in the complaint if they are central to the plaintiff's claim and the parties do not dispute their authenticity.[21]  Here, the Court considers the insurance policy attached to the Complaint, and language quoted in the Complaint from state and local Stay at Home Orders.[22]

## III.   Discussion

Defendant's motion to dismiss argues that Plaintiff fails to allege sufficient facts to demonstrate a "direct loss to Covered Property" under the terms of its all-risk Policy.  Defendant further argues that even if Plaintiff could show direct loss, there is otherwise no coverage under

---

[16] *Id.* (quoting *Twombly*, 550 U.S. at 555).

[17] *Id.* at 679.

[18] *Id.*

[19] *Id.* at 678.

[20] Fed. R. Civ. P. 12(d); *GFF Corp. v. Associated Wholesale Grocers*, 130 F.3d 1381, 1384–85 (10th Cir. 1997).

[21] *See Alvarado v. KOB-TV, LLC*, 493 F.3d 1210, 1215 (10th Cir. 2007); *GFF Corp.*, 130 F.3d at 1384–85.

[22] *See* Doc. 1-1.

the civil authority, ingress/egress, or "Sue and Labor" provisions of the Policy.  Plaintiff responds that it has alleged sufficient facts to demonstrate it suffered a covered loss and that the other provisions apply.  In the alternative, Plaintiff argues that the definition of "loss" is ambiguous and should be construed in its favor.

The parties agree that Kansas law applies.  Under Kansas law, the interpretation and legal effect of an insurance contract is a matter of law to be determined by the court.[23]  In construing an insurance policy, a court must consider the instrument as a whole and interpret the policy language in such a way as to give effect to the intent of the parties.[24]  "If an insurance policy's language is clear and unambiguous, it must be taken in its plain, ordinary, and popular sense."[25] In such a case, there is no need for judicial interpretation or the application of rules of liberal construction.[26]

However, if the policy language is ambiguous, it must be construed in favor of the insured.[27]  "To be ambiguous, a contract must contain provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language."[28] "Ambiguity in a written contract does not appear until the application of pertinent rules of interpretation to the face of the instrument leaves it genuinely uncertain which one of two or

---

[23] *Am. Media, Inc. v. Home Indem. Co.*, 658 P.2d 1015, 1018 (Kan. 1983); *Gerdes v. Am. Fam. Mut. Ins. Co.*, 713 F. Supp. 2d 1290, 1295 (D. Kan. 2010) (quoting *Goforth v. Franklin Life Ins. Co.*, 449 P.2d 477, 480 (Kan. 1969)).

[24] *O'Bryan v. Columbia Ins. Grp.*, 56 P.3d 789, 792 (Kan. 2002) (citing *Farm Bureau Mut. Ins. Co. v. Horinek*, 660 P.2d 1374, 1375 (Kan. 1983)); *Magnus, Inc. v. Diamond State Ins. Co.*, 101 F. Supp. 3d 1046, 1054 (D. Kan. 2015) (citing *Brumley v. Lee*, 963 P.2d 1224, 1226 (Kan. 1998)).

[25] *O'Bryan*, 56 P.3d at 792 (citing *First Fin. Ins. Co. v. Bugg*, 962 P.2d 515, 519 (Kan. 1998)); *Magnus*, 101 F. Supp. 3d at 1054.

[26] *Gerdes*, 713 F. Supp. 2d at 1296.

[27] *Magnus*, 101 F. Supp. 3d at 1054 (citing *Brumley*, 963 P.2d at 1226); *O'Bryan*, 56 P.3d at 793 (citing *Catholic Diocese of Dodge City v. Raymer*, 840 P.2d 456, 459 (Kan. 1992)).

[28] *Gerdes*, 713 F. Supp. 2d at 1296 (quoting *Catholic Diocese*, 840 P.2d at 459).

more meanings is the proper meaning."[29]  A court should not strain to find ambiguity where none exists.[30]  "The test in determining whether an insurance contract is ambiguous is not what the insurer intends the language to mean, but what a reasonably prudent insured would understand the language to mean."[31]

## A.    Direct Loss

The parties dispute the threshold question of whether Plaintiff sustained "direct loss to Covered Property at the premises caused by or resulting from any Covered Cause of Loss," a requirement for all of the coverage provisions claimed by Plaintiff.[32]  Defendant argues that a direct loss to covered property under the Policy requires that the property be physically altered; because COVID-19 did not affect the structural integrity of the covered property, there is no coverage.  Defendant maintains that the lack of a specific virus exclusion is immaterial to the Court's construction of the Policy's use of the term "loss."

Plaintiff responds that under the plain terms of the policy, direct physical loss or damage does not require a tangible, permanent loss or physical alteration of the property.  Instead, a reasonably prudent insured would understand that physical loss or damage includes loss of access or use of the property, which Plaintiff alleged in this case.  In the alternative, Plaintiff argues that "direct physical loss" under the Policy is ambiguous, particularly when read in the absence of a virus exclusion.

 Whether Plaintiff sustained a "direct loss" under the Policy is a question of coverage.  The insured has the burden of proving that the loss is of the type included in the general

---

[29] *Id.*

[30] *Id.*

[31] *O'Bryan*, 56 P.3d at 793 (citing *Bugg*, 962 P.2d at 519).

[32] Doc. 1-1 § A, at 6.

provisions of coverage.[33]  "Loss" is defined by the Policy as "accidental physical loss or accidental physical damage."[34]  Plaintiff points to the dictionary definition of the word "loss," as "the act of losing possession," and argues that a reasonably prudent insured would understand that loss of use or access to the property is a physical loss.[35]  Plaintiff cites to definitions of the word "damage" that include a reduction in the property's "value or usefulness."[36]  But even if the Court adopts these definitions, Plaintiff wholly ignores the modifiers "direct" and "physical" that precede both "loss" and "damage" in the Policy definition.[37]  Although neither word is further defined by the Policy, Plaintiff's interpretation of "loss" and "damage" would write out these modifiers entirely.  Instead, the Court considers the plain meaning of these terms when read together and in conjunction with the Policy as a whole.

"Direct" in this context "is meant to exclude situations in which an intervening force played some role in the property damage."[38]  In the context of modifying the words "loss" or "damage," dictionaries define "physical" as relating to or involving "material things,"[39] "relating

---

[33] *See, e.g.*, *BankInsure, Inc. v. FDIC*, 796 F.3d 1226, 1234 (10th Cir. 2015).

[34] Doc. 1-1 § G(8), at 41.

[35] *See Loss*, Merriam-Webster, https://www.merriam-webster.com/dictionary/loss (last visited Nov. 30, 2020) ("[T]he act of losing possession . . . decrease in amount, magnitude, or degree . . . .").

[36] *See Dundee Mut. Ins. Co. v. Marifjeren*, 587 N.W.2d 191, 194 (N.D. 1998) (first quoting Random House Dictionary of the English Language 504 (2d ed. 1987); then quoting Webster's New World Dictionary 356 (2d ed. 1980); and then quoting Black's Law Dictionary 389 (6th ed. 1990)).

[37] Plaintiff's reliance on *Dundee Mutual Insurance* is inapposite for this reason.  The language from that case quoted by Plaintiff in its brief states that "*without qualification*, the term 'damage' encompasses more than physical or tangible damage."  587 N.W.2d at 194 (emphasis added).  But the term "damage" in the Policy at issue here is qualified by the word "physical."  The explicit plain language of this Policy makes clear that damage does *not* encompass more than physical damage.  Thus, *Dundee Mutual Insurance* does not apply.

[38] 10A Couch on Insurance § 148:60, Westlaw (database updated June 2020) (citing *Advance Cable Co. v. Cincinnati Ins. Co.*, 788 F.3d 743, 746 (7th Cir. 2015)); *see also Loss*, Black's Law Dictionary (11th ed. 2019) (further defining "direct loss" as "[a] loss that results immediately and proximately from an event"); *see also, e.g.*, *Hillcrest Optical, Inc. v. Cont'l Cas. Co.*, No. 1:20-cv-275-JB-B, 2020 WL 6163142, at *6–7 (S.D. Ala. Oct. 21, 2020) (finding "direct" means "immediate or proximate.").

[39] *Physical*, Black's Law Dictionary (11th ed. 2019).

to things you can see or touch, or relating to the laws of nature,"[40] and "having material

existence; perceptible especially through the senses and subject to the laws of nature."[41]

As this Court previously held in *Great Plains Ventures, Inc. v. Liberty Mutual Fire Ins.

Co.*, "physical damage" in an insurance policy is widely accepted to mean "physical

alteration."[42]  While there is no governing Kansas or Tenth Circuit law about the plain meaning

of "direct physical loss" or "direct physical damage" in the insurance context, other circuit court

decisions support the *Great Plains* interpretation that "physical damage" requires actual, tangible

damage.  Case law also supports the interpretation that "direct physical loss" requires some sort

of intrusion or contamination on the property.

For example, the Eleventh Circuit recently addressed a claim for business interruption

coverage under an insurance policy that required suspension of operations caused "by direct

physical loss of or damage to" the property.[43]  The plaintiff owned a restaurant that suffered

business losses during adjacent roadway construction that went on for almost two years.  The

restaurant lost customers, and dust and debris from the construction entered the restaurant,

requiring daily cleaning.  The court found that "under Florida law, an item or structure that

merely needs to be cleaned has not suffered a 'loss' which is both 'direct' and 'physical.'"[44]  The

---

[40] *Physical*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/physical (last visited Nov. 30, 2020).

[41] *Physical*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/physical (last visited Nov. 30, 2020).

[42] 161 F. Supp. 3d 970, 978 (D. Kan. 2016); *see also Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 235 (3d Cir. 2002) (citing 10 Couch on Insurance § 148:46 (3d ed. 1998) ("In ordinary parlance and widely accepted definition, physical damage to property means 'a distinct, demonstrable, and physical alteration' of its structure."); *Universal Image Prods., Inc. v. Fed. Ins. Co.*, 475 F. App'x 569, 574 (6th Cir. 2012) (finding no coverage because the plaintiff "did not suffer any tangible damage to physical property, nor were the Evergreen premises rendered uninhabitable or substantially unusable.").

[43] *Mama Jo's, Inc. v. Sparta Ins. Co.*, 823 F. App'x 868, 878 (11th Cir. 2020).

[44] *Id.* at 879.

Eleventh Circuit reasoned that the words "direct" and "physical" modify "loss," under the policy, which in turn require that the property damage be "actual."[45]  The court relied on state and federal cases finding that direct physical loss requires some sort of actual change in the insured property.[46]  Because the property there did not require removal or replacement of items, only cleaning, the court upheld the district court's determination that the loss was not direct and physical.[47]

The Eighth Circuit has twice weighed in on the plain meaning of direct physical loss or damage.  In *Pentair, Inc. v. America Guarantee & Liability Insurance Co.*, the court considered the policy language "direct physical loss of or damage to property."[48]  There, the plaintiff's supplier could not manufacture orders due to an earthquake that disabled the electrical power station for the supplier's factories.  The plaintiff sought coverage for losses sustained due to the supplier's failure to manufacture the products it needed to meet customer needs for the Christmas season.  The court found that the factories' loss of power did not constitute "physical loss or damage" to property under the policy because there was no physical contamination involved, noting that the plaintiff's interpretation "would mean that direct physical loss or damage is established whenever property cannot be used for its intended purpose."[49]  The court determined

---

[45] *Id.*

[46] *Id.* (citing *Homeowners Choice Prop. & Cas. v. Maspons*, 211 So. 3d 1067, 1069 (Fla. Dist. Ct. App. 2017); *Vazquez v. Citizens Prop. Ins. Corp.*, –So. 3d–, 2020 WL 1950831, at *3 (Fla. Dist. Ct. App. Mar. 18, 2020); *Universal Image Prods., Inc. v. Fed. Ins. Co.*, 475 F. App'x 569, 573 (6th Cir. 2012); *MRI Healthcare Ctr. of Glendale, Inc. v. State Farm Gen. Ins. Co.*, 115 Cal. Rptr. 3d 27, 37 (Cal. Ct. App. 2010); *AFLAC Inc. v. Chubb & Sons, Inc.*, 581 S.E.2d 317, 319 (Ga. Ct. App. 2003)); *see also Newman Myers Kreines Gross Harris, P.C. v. Great N. Ins. Co.*, 17 F. Supp. 3d 323, 331 (S.D.N.Y 2014) ("The words 'direct' and 'physical,' which modify the phrase 'loss or damage,' ordinarily connote actual, demonstrable harm of some form to the premises itself, rather than forced closure of the premises for reasons exogenous to the premises themselves, or the adverse business consequences that flow from such closure.").

[47] *Mama Jo's, Inc.*, 823 F. App'x at 879.

[48] 400 F.3d 613, 614 (8th Cir. 2005).

[49] *Id.* at 616.

that Minnesota law did not support such a broad interpretation of physical loss or damage; some sort of physical contamination is required.[50]

In *Source Food Technology, Inc. v. U.S. Fidelity & Guaranty Co.*, the Eighth Circuit considered a business income claim under policy language that required "direct physical loss to property."[51]  There, the plaintiff sold a beef product provided by a Canadian supplier.  The beef product was manufactured, packaged, and ready for delivery to the United States when the United States Department of Agriculture issued an order prohibiting the importation of certain beef products due to the threat of mad cow disease.  Although not contaminated with mad cow disease, the plaintiff's beef product supply was not shipped due to the embargo and the plaintiff could not fill its supply orders for a period of time.  The court determined that because the beef product was not physically contaminated, there was no direct physical loss:

> Although Source Food's beef product in the truck could not be transported to the United States due to the closing of the border to Canadian beef products, the beef product on the truck was not— as Source Foods concedes—physically contaminated or damaged in any manner.  To characterize Source Food's inability to transport its truckload of beef product across the border and sell the beef product in the United States as direct physical loss to property would render the word "physical" meaningless. Moreover, the policy's use of the word "to" in the policy language "direct physical loss to property" is significant.  Source Food's argument might be stronger if the policy's language included the word "of" rather than "to," as in "direct physical loss of property" or even "direct loss of property."  But these phrases are not found in the policy.  Thus, the policy's use of the words "to property" further undermines Source Food's argument that a border closing triggers insurance coverage under this policy.[52]

---

[50] *Id.* (first citing *Sentinel Mgmt. v. N.H. Ins. Co.*, 563 N.W.2d 296, 300 (Minn. Ct. App. 1997); then citing *Gen. Mills, Inc. v. Gold Medal Ins. Co.*, 622 N.W.2d 147, 151 (Minn. Ct. App. 2001); and then citing *Marshall Produce Co. v. St. Paul Fire & Marine Ins. Co.*, 98 N.W.2d 280, 285 (Minn. 1959)).

[51] 465 F.3d 834 (8th Cir. 2006).

[52] *Id.* at 838; *see also Turek Enters., Inc. v. State Farm Mut. Auto. Ins. Co.*, –F. Supp. 3d–, 2020 WL 5258484, at *8 (E.D. Mich. Sept. 3, 2020).

In line with these decisions, the overwhelming majority of cases to consider business income claims stemming from COVID-19 with similar policy language hold that "direct physical loss or damage" to property requires some showing of actual or tangible harm to or intrusion on the property itself.[53]  The cases cited by Plaintiff in support of a broader interpretation are unavailing.  In *TRAVCO Insurance Co. v. Ward*, the court determined that a direct physical loss can occur if the property is "rendered unusable by physical forces."[54]  There, the property's drywall emitted toxic gases that, while not affecting the structural integrity of the building,

---

[53] *See Raymond H. Nahmad DDS PA v. Hartford Cas. Ins. Co.*, No. 1:20-cv-22833-BLMM/Louis, 2020 WL 6392841, at *8 (S.D. Fla. Nov. 2, 2020) (finding no direct physical loss or damage because the harm was purely economic ); *Uncork & Create LLC v. Cincinnati Ins. Co.*, No. 2:20-cv-00401, 2020 WL 6436948, at *4–5 (S.D. W. Va. Nov. 2, 2020) (finding purely economic losses without physical damage to the insured property does not constitute "physical loss or physical damage" under insurance policy); *W. Coast Hotel Mgmt., LLC v. Berkshire Hathaway Guard Ins. Cos.*, No. 2:20-cv-05663, 2020 WL 6440037,at *4 (C.D. Cal. Oct. 27, 2020) ("Plaintiffs contend that the loss of use of their properties is sufficient to trigger coverage under the Policy.  Under California law, however, a 'detrimental economic impact' alone—as Plaintiffs have alleged—is not compensable under a property insurance contract." (citation omitted)); *Hillcrest Optical, Inc. v. Cont'l Cas. Co.*, No. 1:20-cv-275-JB-B, 2020 WL 6163142, at *6–7 (S.D. Ala. Oct. 21, 2020) (finding Alabama law requires a tangible injury to property under policy requiring "direct physical loss."); *Infinity Exs., Inc. v. Certain Underwriters at Lloyd's London Known as Syndicate PEM 4000*, –F. Supp. 3d–, 2020 WL 5791583, at *3–5 (M.D. Fla. Sept. 28, 2020) (finding that under Florida law and the plain language of the policies at issue, "direct physical loss or damage to the property" requires a showing of actual, concrete damage); *Sandy Point Dental, PC v. Cincinnati Ins Co.*, No. 20 CV 2160, 2020 WL 5630465, at *2 (N.D. Ill. Sept. 21, 2020) (finding direct physical loss requires "some form of actual, physical damage to the insured premises to trigger coverage."); *10E, LLC v. Travelers Indem. Co.*, No. 2:20-cv-04418-SVW-AS, 2020 WL 5359653, at *4–5 (C.D. Cal. Sept. 2, 2020) ("Under California law, losses from inability to use property do not amount to 'direct physical loss of or damage to property' within the ordinary and popular meaning of that phrase.  Physical loss or damage occurs only when property undergoes a 'distinct, demonstrable, physical alteration.'" (quoting *MRI Healthcare Ctr. of Glendale, Inc. v. State Farm Gen. Ins. Co.*, 115 Cal. Rptr. 3d 27, 38 (Cal. Ct. App. 2010))); *Turek Enters., Inc.*, 2020 WL 5258484, at *8 ("'[A]ccidental direct physical loss to Covered Property' is an unambiguous term that plainly requires Plaintiff to demonstrate some tangible damage to Covered Property."); *Malube, LLC v. Greenwich Ins. Co.*, No. 20-22615-Civ-WILLIAMS/TORRES, 2020 WL 5051581, *7–8 (S.D. Fla. Aug. 26, 2020) (finding that direct, physical loss requires actual harm; purely economic losses are insufficient); *Pappy's Barber Shops, Inc. v. Farmers Grp., Inc.*, No. 20-CV-907-CAB-BLM, 2020 WL 5500221, at *4–5 (S.D. Cal. Sept. 11, 2020) (following *10E, LLC*, 2020 WL 5359653, at *4 and finding no direct physical loss or damage based on Stay at Home Orders); *Diesel Barbershop, LLC v. State Farm Lloyds*, –F. Supp. 3d–, 2020 WL 4724305, at *5 (W.D. Tex. Aug. 13, 2020) (acknowledging and distinguishing caselaw that finds direct physical loss without tangible destruction and finding that the loss must be a "distinct, demonstrable physical alteration of the property." (quoting *Hartford Ins. Co. v. Miss. Valley Gas Co.*, 181 F. App'x 465, 470 (5th Cir. 2006))); *Rose's 1, LLC v. Erie Ins. Exch.*, No. 2020 CA 002424 B, 2020 WL 4589206, at *2–5 (D.C. Super. Ct. Aug. 6, 2020) (finding that dictionary definitions and the weight of caselaw support the interpretation that direct physical loss requires a physical change to the insured property).

[54] 715 F. Supp. 2d 699, 708–10 (E.D. Va. 2010), *aff'd*, 504 F. App'x 251 (4th Cir. 2013).

rendered the property uninhabitable.[55]  Unlike in this case, the loss of use in *Ward* was due to an

actual physical force—toxic gases—that rendered the property unusable.[56]  Plaintiff cites *Murray*

*v. State Farm Fire & Casualty Co.* for the proposition that "[d]irect physical loss also may exist

in the absence of structural damage to the insured property."[57]  But *Murray* relies on a Minnesota

Court of Appeals case that *Pentair* and *Source Food* persuasively distinguished because it was

based on the release of asbestos fibers—actual, physical contamination.[58]  Similarly, *Western*

*Fire Insurance Co. v. First Presbyterian Church* found "direct physical loss" due to gasoline

saturation under a church that rendered occupancy unsafe.[59]  There, the court found that the

church was uninhabitable due to "infiltration and contamination" of the church building, even

though the structural integrity of the building was intact.[60]  These cases all found that a physical

force rendered the property unfit for use.  Here, there is no such physical force rendering the

property unusable.  The Stay at Home orders are certainly not a physical intrusion onto the

property.  And while the threat of COVID-19 transmission may prohibit gathering at the

property, there is no allegation that the virus has physically intruded onto the property like the

asbestos, gasoline, or toxic gas described in the caselaw.

  The Court finds that coverage for "direct loss to Covered Property" under the Policy

unambiguously requires more than mere diminution in value or impairment of use of the

---

[55] *Id.*

[56] *Id.*

[57] 509 S.E.2d 1, 17 (W. Va. 1998) (citing *Sentinel Mgmt. Co. v. N.H. Ins. Co.*, 563 N.W.2d 296, 300 (Minn. Ct. App. 1997)).

[58] *See Source Food Tech., Inc. v. U.S. Fidelity & Gar. Co.*, 465 F.3d 834, 837–38 (8th Cir. 2006); *Pentair, Inc. v. Am. Guar. & Liab. Ins. Co.*, 400 F.3d 613, 616 (8th Cir. 2005).

[59] 437 P.2d 52, 55 (Colo. 1968).

[60] *Id.*

property.[61]  Under Kansas law, "[t]he failure of an insurance policy to specifically define a word

does not necessarily create ambiguity."[62]  The presence of the words "direct" and "physical"

limit the words "loss" and "damage" and unambiguously require that the loss be directly tied to a

material alteration to the property itself, or an intrusion onto the insured property.[63]  The Court

follows the majority of courts to consider identical policy language in the context of COVID-19

and holds that direct physical loss or damage to the property requires a tangible, actual change to

or intrusion on the covered property.  Like the restaurant in *Mama Jo's*, Plaintiff alleges no loss

or damage to the property that required repair or replacement based on an actual or tangible

problem with the premises.[64]  And like the plaintiffs in *Pentair* and *Source Food*, Plaintiff suffers

purely economic damages due to temporary loss of use, not a direct, physical change or intrusion

onto the property.

Plaintiff responds that "physical loss" and "physical damage" must be construed and

considered separately so as to give meaning to each term, and that requiring tangible harm to the

property reads out any distinction between those terms.  But the Court has taken care to give

meaning to both terms.  As discussed, the words "direct" and "physical" modify *both* "loss" and

---

[61] The fact that Defendant chose not to include a virus exclusion in the Policy does not render it ambiguous. *See Harmon v. Safeco Ins. Co. of Am.*, 954 P.2d 7, 11 (Kan. Ct. App. 1998).  And if there is no coverage, there is no reason to consider whether an exclusion applies.

[62] *First Fin. Ins. Co. v. Bugg*, 962 P.2d 515, 525 (Kan. 1998).  The Eighth Circuit's decision in *Hampton Foods, Inc. v. Aetna Casualty & Surety Co.* does not support a finding that this Policy language is ambiguous.  787 F.2d 349 (8th Cir. 1986).  The policy language in *Hampton Foods* stated: "[t]his policy insures against loss of or damage to the property insured . . . resulting from all risks of direct physical loss."  *Id.* at 351. The parties disputed whether a "direct physical loss" was required, or merely damage or loss resulting from the *risk* of direct physical loss.  The court found the policy language ambiguous and construed it in favor of the insured.  *Id.* at 352.  Here, the disputed language is "direct physical loss" and "direct physical damage."  There is no "risk" language at issue here; therefore, *Hampton Foods* does not persuade the Court to find the Policy language here ambiguous.

[63] *See, e.g., Sandy Point Dental, PC v. Cincinnati Ins. Co.*, No. 20 CV 2160, 2020 WL 5630465, at *2 (N.D. Ill. Sept. 21, 2020) ("The coronavirus does not physically alter the appearance, shape, color, structure, or other material dimension of the property.  Consequently, plaintiff has failed to plead a direct physical loss—a prerequisite for coverage.")

[64] *Mama Jo's, Inc. v. Sparta Ins. Co.*, 823 F. App'x 868, 878 (11th Cir. 2020).

"damage" under this Policy.  Assuming "loss" can be defined as an interference or reduction in use, caselaw has made clear that when modified by the terms "direct" and "physical," coverage is triggered when there is either "permanent dispossession" of the property, or where the property itself becomes unusable or uninhabitable due to a material intrusion.[65]  While COVID-19 and the Stay at Home Orders temporarily prevented employees and customers gathering at Plaintiff's property, there are no allegations of a material change or intrusion onto the property itself that rendered it unusable.[66]  And there are no allegations demonstrating permanent dispossession.

A few recent district court cases have determined that an allegation of COVID-19 entering the premises through an employee or customer is sufficient to demonstrate direct physical loss or damage.[67]  Thus, Plaintiff asserts that it sufficiently pled physical loss or damage by alleging that the "premises likely have been infected with COVID-19. . . .  It is likely customers, employees, and/or other visitors to the insured property over the last two months were infected with the coronavirus and thereby infected the insured property with the coronavirus."[68]  Plaintiff alleges that despite the limited access to the property due to Stay at Home Orders, the

---

[65] *10E, LLC*, 2020 WL 5359653, at *5 (citing *Total Intermodal Servs. Inc. v. Travelers Prop. Cas. Co. of Am.*, No. CV 17-04908 AB (Ksx), 2018 WL 3829767, at *4 (C.D. Cal. July 11, 2018)); *Pappy's Barber Shops, Inc.*, 2020 WL 550221, at *4; *Rose's 1, LLC v. Erie Ins. Exch.*, 2020 WL 4589206, at *3; *TRAVCO Ins. Co. v. Ward*, 715 F. Supp. 2d 699, 708–10 (E.D. Va. 2010), *aff'd*, 504 F. App'x 251 (4th Cir. 2013) (finding physical loss where property was uninhabitable due to toxic gas released by drywall, despite the fact that the drywall was not structurally damaged).

[66] Plaintiff's reliance on language in the Stay at Home Order recognizing that COVID-19 poses a threat to property is unavailing.  The Court determines the meaning of the Policy based on the plain meaning of the language therein.  *O'Bryan v. Columbia Ins. Grp.*, 56 P.3d 789, 792 (Kan. 2002).

[67] *See Studio 417, Inc. v. Cincinnati Ins. Co.*, –F. Supp. 3d–, 2020 WL 4692385, at *5 (W.D. Mo. Aug. 12, 2020); *Blue Springs Dental Care, LLC v. Owners Ins. Co.*, No. 20-CV-00383-SRB, 2020 WL 5637963, at *4 (W.D. Mo. Sept. 21, 2020); *see also Mudpie, Inc. v. Travelers Cas. Ins. Co.*, –F. Supp. 3d– 2020 WL 5525171, at *5 n.7 (N.D. Cal. Sept. 14, 2020) (noting that if the plaintiff had adequately alleged the presence of COVID-19 in the premises, it would have reached a different conclusion about whether it constituted an "intervening physical force").

[68] Doc. 1 ¶ 15.

incubation period for COVID-19 is fourteen days, and there is evidence that the first COVID-19 death in the United States occurred as early as February 6, 2020.  Plaintiff cites several studies in the Complaint finding that the virus is spread through air droplets and, therefore, is able to spread across distances and can settle on physical surfaces that later infect another person.

The Court finds that Plaintiff's allegation that the virus likely contaminated its property fails to raise a "right of relief above the speculative level."[69]  The health data and studies described in the Complaint do not support the conclusory assertion that the virus was present on the surfaces of Plaintiff's property, causing its losses.[70]  The fact that the virus travels through the air and was present in the United States sooner than first suspected, does not support the assertion that it "likely" exists on the surfaces of Plaintiff's property.  "There is a similar risk of exposure to the virus in any public setting, regardless of artful pleading as to the likelihood of the presence of the virus."[71]  The Complaint alleges that at the time of filing, there were 403 known infections in Johnson County; there is no allegation that any of these infected individuals were ever present on Plaintiff's property, or that employees or customers came into contact with someone who was infected before entering the property.  To accept Plaintiff's conclusory assertion would be to accept the proposition that any business located in a community with COVID-19 infections was likely contaminated with the virus.[72]  The Court declines to accept this speculative assertion, even at the motion to dismiss stage.

---

[69] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

[70] Under this reasoning, any property in the United States that was not completely closed by February 6, 2020 was "likely" infected with the virus.

[71] *Uncork & Create LLC v. Cincinnati Ins. Co.*, No. 2:20-cv-00401, 2020 WL 6436948, at *5 (S.D. W. Va. Nov. 2, 2020).

[72] *See id*. ("[W]hile factual allegations drive the analysis of a motion to dismiss, courts are not required to set aside common sense, and neither *Studio 417*, which relied in part on the allegation of presence of the virus, nor the instant case, involve actual allegations of employees or patrons with infections traced to the business.")

Moreover, even assuming that the virus physically attached to covered property, it did not constitute the direct, physical loss or damage required to trigger coverage because its presence can be eliminated.  Much like the dust and debris at issue in *Mama Jo's*, routine cleaning and disinfecting can eliminate the virus on surfaces.[73]  Plaintiff seeks purely economic damages associated with the suspension of its operations due to COVID-19; it does not claim property damage due to the presence of COVID-19 in its buildings.  The Court echoes the words of another Court faced with deciding this issue:

> Property . . . is not physically damaged or rendered unusable or uninhabitable.  If people could safely congregate anywhere without risk of infection, the Plaintiff has alleged no facts to suggest any impediment to [its] operation.  No repairs or remediation to the premises are necessary for its safe occupation in the event the virus is controlled and no longer poses a threat.  In short, the pandemic impacts human health and human behavior, not physical structures. Those changes in behavior, including changes required by governmental action, caused the Plaintiff economic losses.  The Court is not unsympathetic to the situation facing the Plaintiff and other businesses.  But the unambiguous terms of the Policy do not provide coverage for solely economic losses unaccompanied by physical property damage.[74]

The Complaint fails to allege that Plaintiff sustained a "direct loss to Covered Property" due to COVID-19 and the Stay at Home Orders.  Because there is no direct physical loss or damage alleged in the Complaint, it must be dismissed for failure to state a claim.

### B.      Civil Authority Coverage

The Policy's loss of business income provision covers lost business income as a result of direct loss to Plaintiff's covered property.  The civil authority coverage provision applies when there is a "Covered Cause of Loss," that causes damage to property other than Plaintiff's

---

[73] *Id.* at *5; *Mama Jo's, Inc. v. Sparta Ins. Co.*, 823 F. App'x 868, 878 (11th Cir. 2020).

[74] *Uncork & Create LLC*, 2020 WL 6436948, at *5.

property, and the action of a civil authority makes Plaintiff unable to reach its property.  If Plaintiff shows that a covered cause of loss caused damage to adjacent property, it must meet two additional requirements: (1) access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage; and (2) the action of civil authority is taken in response to dangerous physical conditions resulting from direct physical loss.

First, Defendant argues that Plaintiff cannot show that a covered cause of loss caused damage to property other than Plaintiff's for the same reasons outlined above.  The Court agrees. Plaintiff points to no allegation in the Complaint that sufficiently alleges damage to surrounding property for the same reasons discussed above.  Instead, Plaintiff makes the circular argument that because state and local governments issued Stay at Home Orders in response to the COVID-19 pandemic, this "includes the area surrounding Plaintiff's property."[75]  The allegations in the Complaint are insufficient to demonstrate direct loss, or damage to property surrounding Plaintiff's property.

Second, even if Plaintiff could demonstrate direct physical loss or damage to surrounding property, it has not alleged sufficient facts demonstrating that access to the area immediately surrounding the property is prohibited by civil authority as a result of the damage.  As the Tenth Circuit has explained, "prohibited" means "to 'formally forbid, esp. by authority' or 'prevent.'"[76] The Policy language "requires a direct nexus between the civil authority order and the suspension of the insured's business."[77]  The civil authority action must either prohibit access to

---

[75] Doc. 17 at 17.

[76] *S. Hospitality, Inc. v. Zurich Am. Ins. Co.*, 393 F.3d 1137, 1141 (10th Cir. 2004) (quoting Oxford American Dictionary and Language Guide 795 (1999)).

[77] *Id.*

the business, or require the premises to close.[78]  Having the indirect effect of restricting or

hampering access to the business is insufficient.[79]

The Complaint alleges that some of Plaintiff's employees could not work and risk

becoming infected, that "ingress and egress to the property currently is limited,"[80] and that

customers and suppliers cannot access the property "due to the Stay at Home Orders or fear of

being infected with or spreading COVID-19."[81]  The Stay at Home Orders referenced in the

Complaint do not prohibit employees or the public from entering Plaintiff's premises.  Nor do

the Stay at Home Orders require Plaintiff to suspend its business.  The State of Kansas Order

provides: "Travel to and from work to pick up equipment or supplies needed for telework or

other work-from-home capabilities is allowed so long as employees and employers follow

appropriate safety protocols."[82]  The Johnson County Order similarly allows residents to leave

their homes in order "[t]o perform work providing essential products and services at an Essential

Business or to otherwise carry out activities specifically permitted in this Order, including

Minimum Basic Operations."[83]  Assuming as true the facts alleged in the Complaint, access to

Plaintiff's property was not prohibited by the Stay at Home Orders; therefore, the Policy's civil

authority coverage provision does not apply.

---

[78] *See, e.g.*, *id.* (finding no coverage where the FAA's order stopped airplanes from flying after 9/11, but did not close hotels); *Abner, Herrman & Brock, Inc. v. Great N. Ins. Co.*, 308 F. Supp. 2d 331, 333 (S.D.N.Y. 2004) (finding no coverage after New York City lifted order prohibiting access to plaintiff's premises even though traffic restrictions remained); *Assurance Co. of Am. v. BBB Serv. Co.*, 593 S.E.2d 7, 7–9 (Ga. Ct. App. 2003) (finding evacuation order due to hurricane required closure of plaintiff's business).

[79] *See, e.g.*, *S. Hospitality, Inc.*, 393 F.3d at 1141 (collecting cases).

[80] Doc. 1 ¶ 15.

[81] *Id.* ¶ 16.

[82] Kan. Exec. Order No. 20-16 ¶ 3 (Mar. 28, 2020), https://governor.kansas.gov/wp-content/uploads /2020/03/EO20-16.pdf.

[83] Dr. Joseph LeMaster, Johnson County Emergency Order of Local Health Officer at 2 (Mar. 22, 2020), https://www.jocogov.org/sites /default/files/documents/CMO /JoCo%20Public%20Health%20Officer%20Stay %20at%20Home%20Order%203-22-20.pdf ;

Plaintiff further argues that because the word "prohibited" is not defined by the Policy, it is at least ambiguous and should therefore be resolved in its favor.  As discussed earlier in this Order, the fact that a word is not defined in an insurance policy does not mean it is ambiguous.[84] The Court finds that the meaning of "prohibited" in this Policy is unambiguous, as described above.  Because the Complaint fails to allege that the Stay at Home Orders prohibited access to Plaintiff's property, coverage does not apply and Defendant's motion to dismiss is granted on this additional basis as to the civil authority coverage claim.

C.     **Ingress/Egress and Sue and Labor Provisions**

Defendant argues that the remaining coverage provisions claimed by Plaintiff do not apply here.  Coverage under the ingress/egress provision requires "direct 'loss' by a Covered Cause of Loss at a location contiguous to" Plaintiff's property.  It also requires "the prevention of existing ingress or egress," from the Covered Cause of Loss.   Again, the Complaint fails to allege that there was direct physical loss or damage at a location contiguous to the property. Plaintiff fails to even identify a contiguous property for purposes of this coverage provision. Also, as discussed under the Civil Authority coverage section, the Complaint admits that the premises was accessible despite the Stay at Home Orders.  Therefore, assuming as true the facts alleged in the Complaint, COVID-19 did not prevent ingress or egress from Plaintiff's property.

Finally, Plaintiff asserts coverage under the "Sue and Labor" provision.  But Defendant correctly points out that this provision is plainly not a coverage provision.  Instead, it provides that the insured has certain duties in the event of loss or damage, including to protect the covered property from further damage, and "[k]eep a record of . . . expenses necessary to protect the

---

[84] *First Fin. Ins. Co. v. Bugg*, 962 P.2d 515, 525 (Kan. 1998).

Covered Property for consideration in the settlement of the claim."[85]  Plaintiff fails to address this argument in the response brief, or provide any meaningful explanation about how this coverage section applies.  The Court finds no coverage under the plain language of this Policy provision as applied to the well-pled facts alleged in the Complaint.

    **IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion to Dismiss (Doc. 7) is **granted**.  Plaintiff's Complaint is dismissed with prejudice.

    **IT IS SO ORDERED.**

    Dated: December 3, 2020

S/ Julie A. Robinson
JULIE A. ROBINSON
CHIEF UNITED STATES DISTRICT JUDGE

---

[85] *Id.* § D(3)(A)(4), at 33–34; § C(2)(a)(4), at 79.